Your Honor, good morning. Gary Burcham on behalf of Petitioner Daniel Martinez. This Court should grant habeas relief to Mr. Martinez because the state court decision simply cannot be squared with the entire record and with any reasonable construction of that record. The government concedes that Mr. Martinez made a full and complete invocation of his right to counsel during the interrogation, so we need to get to what happened post-invocation. Was there a continued interrogation? And if there was a waiver, was the waiver knowing involuntary? The California Court of Appeal found that Mr. Detective Navarro's conduct was proper. It found that there was nothing deceptive or coercive in his response regarding whether he could get a hold of the attorney and that he had no option but to book Mr. Martinez. The problem with this conclusion and with the state court's analysis is that it omits and leaves out the most important part of the exchange, which is when Navarro told Petitioner not once but twice that he had no option but to book him because he was not talking to him. The comments of the ---- Kagan. It's the because, right? It's the because. Martinez. Exactly. Kagan. You're going to be charged with murder because I didn't get your side of the story. Martinez. Exactly. Kagan. Essentially, that's what you're zeroing in on. The California Court of Appeals doesn't address that sentence? Martinez. The California Court of Appeals addresses, links up whether they can get a hold of the attorney and whether he has an option to book him. And if you just look at that, I don't think it's terribly problematic. But the problem is that's not what Detective Navarro did. Detective Navarro linked up the invocation of counsel and the fact that he was going to be booked at that point because he was not talking to them. And that's what Kagan. But the state court of appeals approach seemed to be that you go through this exchange and everything that Detective Navarro said was accurate, right? No statement he made was, you know, misleading or misstating the facts. Wasn't that the approach of the state court of appeal? Martinez. Essentially, they went through the record and said what he said was not coercive. Kagan. All right. What's wrong with that approach? Well, what's wrong with that approach is you can't tell a defendant that if he doesn't talk, he's going to be booked. And that's the inducement that the cases have said you just can't do. You can tell someone what's coming in the future. You can tell someone the state of the evidence. The government cites a whole bunch of cases where there was exchanges between a detective or an agent and a suspect, and the courts have said that those were okay in those cases. But none of those cases have what we have here, which is the inducement, which is you're going to be booked because you're not talking to us. And that creates the converse, which is if you talk to us, you might not be booked. And that's exactly how Mr. Martinez understood it. If you look throughout the later on post invocation, he says a couple of times that, you know, I want to talk because I want to walk out of here. And so that's exactly what Detective Navarro wanted to wanted to say, wanted to imply to Mr. Martinez, that's exactly how Mr. Martinez took it. And that's the problem we have here, which is the inducement, the immediacy. I cited to the court the Rodriguez v. McDonald case from last year, which really does have all of these components that we have in this case. Kagan. But a much younger defendant. It was a 14-year-old. Can I ask you a couple questions? I think you — it's uncontested there was an invocation. And I think we understand your argument about because and why that was reinitiating. Was there a State court ruling on prejudice? State court ruling, I — there certainly was, I believe, with the — with the — in the Federal court. Prejudice, I can't answer that right now. Prejudice, the government says there was no prejudice because the evidence of guilt was overwhelming. What about — what about the statements that your client made afterwards, in the immediate aftermath? At the House, to the people. Right. After the shooting on the day he ran to a home, there's another Mr. Lopez who testified about — about those statements. Right. And the jury heard that testimony. Right. So what about that? Those certainly were not helpful for his defense. But I would submit that because the defense for Mr. Martinez was self-defense, you could go to someone's house after that event, say those stupid things, those boastful things, but that doesn't mean it wasn't self-defense when the event occurred. And so those came in. It certainly didn't paint Mr. Martinez in a positive light. But those statements were not inconsistent with having acted in self-defense at the scene. Because — because he could have said those things in the context of I shot first so I didn't get shot. Exactly. Is that your argument? Because they're very callous statements. They're callous. They're — they're unsavory. Right. But if, you know — but it doesn't mean that, you know, hey, I smoked this guy. It doesn't mean that I thought he was about to shoot me. And so that's why I think that those are not extraordinarily strong evidence that the government says they are, because those are still consistent with the self-defense theory that they had — that they had at trial. Your client stayed in that home for a very extended period of time after — in the immediate aftermath of the — of the shooting. Right. Did Mr. Lopez, the Mr. Lopez who was an occupant of that home, ever testify over — that at any point your client made a comment about seeing a gun or being concerned about a gun or — or that he shot in self-defense? Lopez did not. The one who did is Sandoval, the — the cooperating witness who got a nice deal for his testimony. He's the one who testified that Mr. Martinez said that thing, I didn't do it, or something like that before the shooting. Right, right. The person, Mr. Lopez, did not hear anything, and — and that was what came into evidence. All right. I have four minutes left, and the court has — Do you want to reserve? Yeah. I'll hold that for rebuttal. Thank you very much. Good morning, Your Honors. Brian Means for the appellant, Matthew Cate. I'd like to answer Judge Kristen's question regarding the state court record on prejudice. The state court did not turn to prejudice, having found no Miranda error. So there's nothing to defer to, right? No. But as the Supreme Court in Frye has illustrated, the Brecht harmless error standard that's applied in collateral review subsumes an ADPA-slash-Chapman analysis of harmless beyond a reasonable doubt, so it's really superfluous here. The higher standard already applies. But I think — is it correct that the State has conceded that the defendant invoked his — He did invoke. Okay. So then what's your next best argument about because? I want to address briefly the issue of the statement of facts that the state court had somehow misconstrued the facts and therefore no deference is applied as — The argument that it was unreasonable, a D-2 argument, is unreasonable because the state court didn't grapple with the sentence about you're going to be booked because —  That's how I understand their argument. Okay. And what's your response to that? Well, that was argued for the first time in the reply brief. And as I had already argued in a — my 28-J letter that was filed last week, that argument now was waived. It wasn't raised in the district court. It wasn't raised in the opening brief. So it's a D-1 argument. But in addition to that, even on the merits, there was no reason for the state court to have addressed those specific phrases based upon the way the argument was presented to the state court on direct appeal. It was presented a little different than the way it has been presented on federal habeas, not enough that it would un-exhaust the claim, I think. But their approach was that they had — the Detective Navarro had somehow misled the Martinez into thinking that he couldn't get an attorney. So the statement, the because statement, wasn't relevant to that analysis, and that's why it's not in there. There's a place in the transcript where the defendant seems to ask — he seems to say, I have to call Percy kind of thing. That's correct. And then the detective says, yes, you're going to have to call your lawyer. Is that what you're referring to? That's — that's — you think that was the emphasis in the — in the trial court? Well, in — in the State appellate court, the focus was on that part that you're referring to. That was the argument as the direct appeal counsel framed it. That the defendant was left with the impression — Was misled, yes, about the ability to have an attorney. Okay. That's not the argument that they're really raising here. It's kind of shifted a little bit. But that explains why the State court of appeal didn't grapple with the specific language we're talking about right now. Turning to the — the prejudice analysis itself, the prejudice was briefed by the parties here under the Brex standard. And essentially, their argument is twofold. One is that Navarro was able to repeat Martinez's statement about not having seen any guns. Martinez didn't say there were no guns. He just said he didn't see anything. But then he qualified that and said, but there could have been. They could have had something. They could have had the secret of the weapon. That's consistent with what every other witness had said. So his saying that and bringing that in at trial doesn't cause any prejudice. It's consistent with the testimony. In fact, had he said something to the opposite, that would have been incredible for him to have been the only one to have seen something when all the other witnesses say, no, we didn't actually see a gun. The second thing is, is that they had asked him if he felt threatened. Navarro had asked Martinez, did you feel threatened? He vacillated. First he says yes, and then he ultimately says no. So I mean, you don't really get a whole lot from that. But most importantly is that Martinez's defense was, I wasn't involved in this whole thing. This isn't my thing. I'm not the shooter. So I'm not part of this. So the whole question of whether or not he saw a gun or how frightened he really was at first, yeah, I was frightened, no, I guess I wasn't. That's not really helpful to his defense anyways. So in the totality, those two things coming in don't really make much of anything. Now also, they also were able to bring in the drinking. He had, Navarro had testified that Martinez had said that he had been drinking and he was a belligerent as a result of that. We don't know what the jury made of that testimony. And somewhat, it is speculative. But we do know they did not find him guilty of first degree murder. They did not find premeditation and deliberation as they did for his counterpart. That evidence that he was intoxicated and belligerent could be the reason they found an absence of premeditation and deliberation. As far as the Rodriguez case, I think the court has already pointed out that that's readily distinguishable. First of all, it's not an ADPA case as this one is. It was reviewed de novo. In that particular case, after the individual had invoked his right to counsel, they continued to interrogate him. I mean, they're asking him questions. So there's a blatant violation right there. And second of all, when they get to the voluntariness of him, they find that it's a 14-year-old boy, borderline intelligence disability with a low IQ, suffered from a mental disorder, had ADHD. And with respect to the second prong of voluntariness, they found that the detectives had said that if you cooperate, you'll get better treatment. So basically, they had phrased it that you're going to be penalized if you invoke your Miranda right. So the result in that case is not very surprising. Am I correct in California that the rule on voluntary intoxication is that it can only be considered in a limited way? It can be, but — It's not a defense. No. But it can deprive the ability of the prosecutor to prove premeditation and deliberation. So it can go to that mental state. And was the jury — was the jury instructed on voluntary intoxication, if you know? No, but it wasn't a defense in that basis. But they were instructed on, of course, the elements of murder, and they were given the instruction for premeditation and deliberation. Now, with respect to his statement, the because statement itself, what I think Navarro is saying here is we're viewing this whole thing in context, is he meets with him, he tells him right off, look, I've talked to the opposing gangs, and they're saying you're responsible. You're the murderer here. So I'd like to get your side of the story. But you want to have your attorney, Percy, with you. Okay. We'll do that. So you'll tell me your side of the story with Percy. But it's after 7 o'clock at night. We're not going to get Percy here at that hour. So he says, I'm pretty much done with you, which is what he should say. So I'm going to go ahead and book you. So he's pretty much following the letter of the law here. He's telling him, I wanted to talk to you. You want Percy. Percy's not here. I'm done with you. That's it. So I've got no choice left but to book you, which is accurate. After all, all the witnesses, from Navarro's perspective, all the evidence is, is he's involved in the murder. Then Martinez reinitiates and says, what are you going to book me for? And that's when he says the second statement, well, I'm going to book you for murder because I only have your side of the story. That's not an invocation of an attempt on the part of Navarro to say, hey, but if you tell me your side of the story, things could go better for you. It's certainly implied, though, it seems to me. It's an unfortunate choice of words, but I think we have to look at it into the context of what he was saying before, which immediately before that, he just went over it. I got their side of the story. I want your side of the story. You said you'll give me your side of the story if you have Percy here. We don't have Percy here right now. So I'm just going to go ahead and book. I'm done with you. So I'm just going to go ahead and book you. And then he says, what are you going to book me for? I'm going to book you for murder because I only got one side of the story. I mean, he's kind of explaining why he's having to do what he has to do. He didn't need to say that. But I think he was trying to be conciliatory, like, look, this is my job. I have no choice here. I don't construe this as an attempt to pressure him in to somehow say something incriminatory. If we look at the Innis test, you know, is this the kind of statement that would reasonably elicit an incriminating response? And based upon the slew of cases that I cited in my brief, I think that's a resounding no. That's not the type of statement that's going to cause someone to suddenly blurt out and go ahead and make an inculpatory admission. You say that's the way you interpret it now. But one, first of all, the State Court of Appeal didn't address that statement, right? It addressed the claim. And that's all that's required. That statement. It didn't address that statement. It didn't specifically mention that statement in its analysis. It did mention that statement when it's going through the whole transcript. And it goes item line through line in its analysis, basically. So it's not the way it's supposed to be. Kennedy, what I'm getting at is, did the State Court of Appeal say enough about that statement that its interpretation would be entitled to deference? Yes. Interpretation of the statement. I don't think it really made an interpretation of the statement. That's what I'm getting at. What is our standard of review? I see I'm out of time, Mayor. If I agree with you, you know, whether I agree with your interpretation depends, I think, a great deal on the standard of review. I see I'm out of time, Mayor. Respond to that question. Of course. I think what we're dealing here is, is the State court is not required to set forth all of its analysis. Indeed, sometimes they can just do it with a summary denial. And there's no indication that they somehow missed the issue. Indeed, they put verbatim in the entire transcript of the hearing, including this language. Then, instead of just focusing on one narrow issue, the court goes through it step by step, okay? He invokes, and then this statement happens, and then this goes through. And then they do an analysis, about a seven-step analysis of the whole thing. They don't break it down into subsets of this particular language. But they do start with the interrogation to the reinitiation to the ultimate waiver at the end and everything in between. They just don't happen to mention this particular sub-issue. And I don't think they're required to under AEDPA. They adjudicated the claim on the merits, and that's all that D-1 requires. Thank you, counsel. Thank you. Okay. Thanks. I misspoke, Judge Christen. There was not a prejudice analysis on this issue in the R&R or in the district court order. Right. I don't think so, either. So what's the standard of review? Well, I argue that it should be de novo. I set forth the fact that the State court just essentially ignored this salient, crucial part of the exchange between Mr. Martinez and Detective Navarro. And 2254 says if there's an unreasonable determination of facts, then this court reviews de novo. That's what happened in the Rodriguez case. And, you know, the government says, well, they listed the whole transcript. It's all in there. But when it came to the analysis, when it came to the fact finding as to what the issue was with this Miranda, it just omitted that part of those two statements. And that is the most important part of the exchange between Martinez and Detective Navarro. With respect to prejudice. Well, what about Mr. Means' statement that, well, the case was argued differently in the State court? Well, there was more of a focus on the, you know, did he trick them by saying that, you know, you have to call the lawyer versus, you know, we can get the lawyer. But there was the claim was there that it was a coerced waiver and that it violated Miranda. So I think it wasn't as squarely presented as we've done in this appeal here before Your Honors, but it certainly was alive and presented in the State court. And so I think that the fact that the State court just forgot to deal with that, with And the government, it says it was an unfortunate choice of words. I mean, this was an experienced detective doing exactly what he could to get this gentleman to talk after he'd invoked his right to counsel. He made the initial statement. He piggybacked on that with the second statement. And there's no doubt that he was doing exactly what he intended to do. And the results are not surprising, because, you know, if someone's sitting in that room with a detective and he wants to talk about something like this, the greatest incentive on the planet to give that person is that, look, if you talk to me, you know, you may go home. And that's exactly what he did. The result was predictable. And so I would submit to the Court that the de novo standards should apply in this case under de novo review. This was a clear violation of Miranda, Edwards, Roberson, Oregon v. Bradshaw. And, Counsel, your best prejudice argument, even under de novo review, is that the statements he made, the ones we've – my word was countless. Right. After the shooting, that those are not inconsistent with self-defense. Is that it? Yes, ma'am. That is my answer with respect to those statements. And with respect to the trial evidence, it was a close case for Mr. Martinez. He wasn't the shooter. There was no doubt about that. There was conflicting evidence about where the victim was when he was shot. Was he running away or was he facing? And the forensic evidence showed that he was actually facing the person who shot him, Mr. Lopez. There's an issue about – there's an issue about whether he told Mr. Lopez to do it or not. Mr. Lopez said no. The stand of all the cooperating witnesses said yes. There was conflicting testimony on who got the gun and whether it involved Mr. Martinez. So for the government to say that this is an overwhelming evidence case, this is a conspiratorial liability case for Mr. Martinez. He was not the shooter. And so they had this gang expert come in and talk about people do things for the gang. And, you know, I think that's a tenuous theory out of the gate. But when you have this conflicting evidence tacked on to that conspiratorial theory, I think we have actually a fairly weak case against Martinez. And the testimony of Detective Martinez – excuse me, Detective Navarro, that he said, I wasn't scared and I never saw a gun, was devastating. It was devastating to his self-defense claim. And for that reason, I think the court should reverse. Thank you, counsel. Thank you. Thank you both for your arguments. The case just argued to be submitted for decision.
judges: Tashima, Thomas, Christen